1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARI SHIELDS, et al.,<br><br>                Plaintiffs,<br><br>      v.<br><br>WALT DISNEY PARKS AND<br>RESORTS US, INC., et al.,<br><br>                Defendants. | Case No. CV 10-05810 DMG (JEMx)<br><br>**ORDER RE PLAINTIFFS' MOTION<br>FOR CLASS CERTIFICATION** |

     This matter is before the Court on Plaintiffs' Motion for Class Certification.  The Court held a hearing on April 15, 2011.  Having duly considered the respective positions of the parties, as presented in their briefs and at oral argument, the Court now renders its decision.  For the reasons set forth below, Plaintiffs' Motion is GRANTED in part and DENIED in part.

# I.
# PROCEDURAL HISTORY

     On May 21, 2010, Plaintiffs Cari Shields and Amber Boggs, on behalf of themselves and all others similarly situated, filed a complaint in Los Angeles County Superior Court against Defendants Walt Disney Parks and Resorts US, Inc. ("Disney Parks"), Walt Disney Parks & Resorts Worldwide, Inc., the Walt Disney Company, and

Does 1 through 100. Plaintiffs assert violations under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, California's Unruh Act, Cal. Civ. Code § 51, and the California Disabled Persons Act ("CDPA"), Cal. Civ. Code § 54.1. Defendants removed the action to this Court on August 5, 2010 on the basis of federal question jurisdiction, 28 U.S.C. § 1331.[1]

Plaintiffs filed the operative First Amended Complaint on September 10, 2010 [Doc. #16]. The First Amended Complaint also asserts violations of the ADA, the Unruh Act, and the CDPA. It adds Teresa Stockton as a plaintiff and names as defendants only Disney Parks, Disney Online, Inc. ("Disney Online"), and Does 1 through 10.

On February 14, 2010, Plaintiffs filed the Motion for Class Certification [Doc. #41]. Defendants filed their Opposition on March 28, 2011 [Doc. #73]. Plaintiffs filed their Reply on April 4, 2011 [Doc. #80].

## II.

## FACTUAL BACKGROUND

### A.    The Parties

Plaintiffs are visually impaired individuals.[2] (Compl. ¶¶ 8(b), 9(b), 10(b).) Plaintiff Cari Shields is an annual pass holder for the Disneyland Resort in California, which consists of Disneyland and California Adventure, and has visited Disneyland Resort numerous times during the past two years. (Shields Depo. at 54:10-22; Mot., Ex. D at Resp. #8; .) Shields also has visited the Walt Disney World Resort in Florida—

---

[1] Defendants also invoke 28 U.S.C. § 1369 as a basis for removal. (Notice of Removal ¶¶ 1, 5.) Section 1369 does not apply, however, because the instant action does not "arise[] from a single accident, where at least 75 natural persons have died in the accident at a discrete location." 28 U.S.C. § 1369(a).

[2] The Court recognizes that some persons prefer the term "blind and partially sighted." (*See, e.g.*, Cohen Decl., Ex. 27 at 510 ("The preferred term for Visual [sic] Impaired is 'Blind and the partially sighted.'"). *But see, e.g.*, *id*. at 528 ("My husband and I are both visually Impaired/legally blind . . . ."); *id*., Ex. 28 at 547 (using the term "visually impaired and blind"); *id*., Ex. 29 at 564 ("I am visual [sic] impaired . . . .").) For brevity, the Court adopts Plaintiffs' use of the term "visually impaired" to refer to blind and/or partially sighted individuals.

which consists of the Magic Kingdom, Epcot, the Animal Kingdom, and Hollywood Studios— twice during the past two years.  (Shields Depo. at 50:17-20, 57:1-13; Mot., Ex. D at Resp. #8; Jones Depo ¶ 8.)  Shields utilizes the services of a service animal to help guide her.  (Mot., Ex. D at Resp. #4.)  Shields intends to visit the Walt Disney World Resort in the future.  (Shields Depo. at 50:24-51:1.)

Plaintiff Amber Boggs is an annual pass holder at the Disneyland Resort.  (Boggs Depo. at 112:20-113:17.)  Like Shields, Boggs utilizes a service animal to assist her.  (*Id*. at 56:1-18; Mot., Ex. E at Resp. #4.)  Boggs has been to the Disneyland Resort several times in the last two years.  (Mot., Ex. E at Resp. #8.)  Boggs intends to visit the Disneyland Resort in the future and possibly the Walt Disney World Resort.  (Boggs Depo. at 69:8-15.)

Plaintiff Teresa Stockton has visited the Walt Disney World Resort two times in the last two years.  (Mot., Ex. F at Resp. #8.)  Stockton also uses a service animal to assist her.  (*Id*. at Resp. #4; Stockton Depo. at 68:2-5.)  Stockton intends to visit the Disneyland Resort in the future.  (Stockton Depo. at 159:8-12.)

Defendant Disney Parks owns and operates the theme parks at the Disneyland Resort in California and the Walt Disney World Resort in Florida.  (Jones Decl. ¶ 3.)  Defendant Disney Online owns and operates certain websites associated with The Walt Disney Company.[3]  (Davis Depo. at 63:9-21.)  Disneyland and the Walt Disney World Resort provide entertainment to millions of guests annually through a vast array of rides, parades, shows, interactive facilities, and meet-and-greet opportunities with costumed

---

[3] The parties dispute whether Disney Online owns and/or operates the websites at issue here. Defendants contend that an entity named Walt Disney Parks and Resorts Online owns and operates the sites www.disneyland.com, www.waltdisneyworld.com, and www.disneyparks.com.  (*See* Opp'n at 8, 40; Davis Depo. at 33:2-8.)  Plaintiffs do not refer to these specific sites in their First Amended Complaint.  Rather, they allege that Defendants "maintain one or more websites including www.disney.go.com that are not fully accessible for persons with visual impairments."  (1st Am. Compl. ¶ 11(c)(12).)  There is evidence that Disney Online operates the disney.go.com webpage.  (*See* Davis Depo. at 63:13-14.)  Because the record as to this issue is not sufficiently developed, the Court cannot and need not resolve the disputed issue at this time.

characters bringing Disney's motion picture heritage to life.   (Jones Decl., Ex. 3.) "Parades" and "shows" cover a wide range of forms and formats; parades and shows feature lively music, water and lighting effects, characters, and other entertainers who perform a wide range of routines, songs, and dances.  (*Id*.)  Parades also feature floats proceeding along designated routes through the parks; shows are at stationary locations indoors and outdoors.  (*Id*.)  Rides take many forms:  boats, cars, planes, teacups, through fictional settings, from slow-moving to thrilling.  (*Id*.)

**B.   Plaintiffs' Allegations**

Plaintiffs allege that Defendants discriminate against visually impaired individuals and fail to provide reasonable accommodations by

(1)    maintaining a policy of refusing to allow costumed Disney characters to interact with visually impaired patrons with service animals at their theme parks, hotels, restaurants, and shops;

(2)    failing to provide signage in Braille and/or large print so as to orient visually impaired patrons as to the location of rides, restaurants and facilities;

(3)    failing to provide schedules and menus in accessible alternative formats such as Braille and/or large print;

(4)    failing to read the menus in full upon request by visually impaired patrons;

(5)    failing to provide Braille maps in a mobile format;

(6)    failing to provide Braille maps in a reasonable number of locations within the theme parks, hotels, restaurants, and shops;

(7)    providing audio description devices which are designed to shut off automatically after a given time interval but cannot be re-set by a visually impaired user, thus rendering the device inaccessible;

(8)    failing to provide reasonable designated areas within the theme parks, hotels, restaurants, and shops for service animals to defecate;

(9)    charging visually impaired patrons using service animals a $20 fee for the use of kennel facilities;

(10)    locating the kennel facilities outside of the theme parks;

(11)    refusing to allow service animals to be tied to any locations within the theme parks while the visually impaired owner is using park rides;

(12)    simultaneously refusing to provide a Disney employee to assist a visually impaired patron and also requiring visually impaired patrons to pay full price for a ticket for an aide or attendant to serve the function of assisting the patron in navigating around the theme parks;

(13)    maintaining a policy at parades that only wheelchair users may use the area designated for handicapped guests and not guests with other disabilities such as visual impairments;

(14)    renting lockers to park visitors that are inaccessible to persons with visual impairments because they utilize an inaccessible touch screen, have no attendant to assist the visually impaired, and provide only a printed receipt with the combination to open the rented locker; and

(15)    maintaining one or more websites that are not fully accessible for persons with visual impairments utilizing screen reader software.

(1st Am. Compl. ¶ 11(c).)  Plaintiffs seek declaratory and injunctive relief.  (*Id*. at 36-39.)

## C.    <u>Plaintiffs' Proposed Classes</u>

Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs move to certify the following 10 classes:

(1)    **DISNEY CHARACTER CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who were or will become customers of the theme parks, hotels, restaurants, and shops at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida and who were or will in the

future be denied interaction and equal treatment by Disney employees dressed as Disney characters.

(2) **SIGNAGE CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have not been or upon visiting in the future will not be provided signage, menus or schedules in an alternative format, such as Braille and/or large print and were not read, in full, the menus, at the theme parks, hotels, restaurants, and shops in Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

(3) **MAP CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926 who have not been or who upon visiting in the future will not be provided maps in an alternative format, such as Braille and/or large print, at the theme parks, hotels, restaurants, and shops in Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

(4) **KENNEL CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have either (1) paid a fee for the use of a kennel for his/her service animal at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida; (2) been deterred from visiting Disneyland/California Adventure in California or the Walt Disney World Resort in Florida on account of the kennel fee for his/her service animal; (3) been deterred from visiting Disneyland/California Adventure in California or the Walt Disney World Resort in Florida and its theme parks, hotels, restaurants, and shops on account of there

being no reasonable designated areas for service animals to defecate; or (4) been deterred from visiting Disneyland/California Adventure in California or the Walt Disney World Resort in Florida and its theme parks by refusing to allow service animals to be tied to any locations within the theme parks while the visually impaired owner is using park rides, or who will suffer such deterrence from, or treatment upon, visiting the Resorts in the future.

(5)    **AUDIO DESCRIPTION DEVICE CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have used or attempted to use, or who will upon future visits use or attempt to use, an audio description device at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida and been deprived of the full use and enjoyment of the device.

(6)    **COMPANION TICKET CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have paid for, or who will upon future visits be required to pay for, an additional ticket for a companion or aide to assist the visually impaired individual to utilize the accommodations at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

(7)    **PARADE CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have experienced discrimination, or who will upon future visits experience discrimination, due to Defendants' policy of excluding persons with

disabilities, other than wheelchair users, from preferential locations to stand or sit during the parades and shows at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

(8)   **LOCKER CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have been or who will upon future visits be unable to utilize a locker at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

(9)   **WEBSITE CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who have been or who will in the future be unable to access one or more of the websites maintained by Defendants such as www.disney.go.com and were or will be denied equal access to Defendants' theme parks, hotels, restaurants, and stores and the numerous goods, services and benefits offered to the public through DEFENDANTS' websites.

(10)  **PARKING CLASS:**  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102 and California Government Code Section 12926, who were or will in the future be customers of the theme parks, hotels, restaurants, and shops at Disneyland/California Adventure in California and were or will be denied equal treatment due to Defendants' failure to comply with accessible parking provisions of the Americans with Disabilities Act Accessibility Guide ("ADAAG"), Americans with Disabilities Act, and/or Title 24 of the California Code of Regulations. Additionally, Defendants' parking structure and parking lot at Disneyland are violating the following provisions of the ADAAG:

4.6.2, 4.1.2, 4.1.3, 4.7.7, 4.29.2 and 4.29.5; all so as to violate the Americans with Disabilities Act and Title 24 of the California Code of Regulations.

(Mot. at 4-7.)

### III.

### <u>LEGAL STANDARD</u>

Rule 23 provides district courts with broad discretion in making a class certification determination. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (recognizing that district courts "have broad power and discretion vested in them by Fed. Rule Civ. Proc. 23"). Nonetheless, a court must exercise its discretion "within the framework of Rule 23." *Navellier*, 262 F.3d at 941. A district court may certify a class only if the following prerequisites are met:

    (1)    the class is so numerous that joinder of all members is impracticable;

    (2)    there are questions of law or fact common to the class;

    (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These prerequisites "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart Stores, Inc. v. Dukes*, __ U.S. __, 2011 WL 2437013, slip op. at 8 (June 20, 2011).

If the Rule 23(a) requirements are satisfied, a class action may be maintained pursuant to Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The party seeking certification bears the burden of demonstrating that it meets the Rule 23(b) requirements. *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 n.9 (9th Cir. 2009) (citing

1   *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001)).  The Rule 23

2   analysis must be rigorous to ensure that its prerequisites have been satisfied, and such

3   analysis will often require looking beyond the pleadings to issues overlapping with the

4   merits of the underlying claims.  *Dukes*, slip op. at 10.

5                                                      **IV.**

6                                           **DISCUSSION**

7   **A.     The Contingent Nature Of Some Putative Class Members Does Not Bar**

8           **Certification**

9           In the Motion for Class Certification, Plaintiffs expand the putative class

10  definitions from those in their First Amended Complaint to include unknown, future

11  victims of Defendants' alleged misconduct.  (*See* Notice of Mot. at 4 n.1; Mot. at 8.)

12  Defendants challenge the "inclusion of hypothetical future claimants . . . under principles

13  of Article III standing [and] ripeness."  (Opp'n at 14.)  Defendants' argument is without

14  merit.   "The inclusion of future class members in a class is not itself unusual or

15  objectionable.  When the future persons referenced become members of the class, their

16  claims will necessarily be ripe."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir.

17  2010) (citations to *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986),

18  and *LaDuke v. Nelson*, 762 F.2d 1318, 1321-26 (9th Cir. 1985), omitted).  Thus, to the

19  extent Defendants' current conduct and/or policies adversely affect visually impaired

20  individuals who have visited or who plan to visit Disney theme parks, there is no reason

21  why their alleged conduct and/or policies would not continue to affect visually impaired

22  persons in the future.

23  **B.     Plaintiffs' State Law Claims Must Be Limited To The Disneyland Resort**

24          Plaintiffs seek to certify ten nationwide classes for claims under both federal and

25  state law.   Although neither party has raised the issue, the Court has serious doubts

26  whether Plaintiffs can enforce California statutes—the Unruh Act and the CDPA—with

27  respect to Defendants' operations in Florida.  Normally, in such situations, courts certify

28  a subclass for claims arising under state law.  *See, e.g.*, *Nat'l Fed'n of the Blind v. Target*

*Corp.*, 582 F. Supp. 2d 1185, 1209 (N.D. Cal. 2007) (certifying a nationwide class for claims under the ADA and a subclass of individuals in California for claims under the Unruh Act and the CDPA).

Plaintiffs have not moved to certify a subclass and the Court declines to do so *sua sponte*. Accordingly, the Court considers Plaintiffs' proposed classes in the context of their ADA claims only. For any nationwide class that the Court certifies, if it becomes apparent that the ADA cannot afford complete relief, the Court may revisit certification of subclasses for Plaintiffs' state law claims with respect to Defendants' operations at the Disneyland Resort in California.

## C.   The Rule 23 Factors

### 1.   Numerosity

A putative class may be certified only if it "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'[I]mpracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting *Adver. Specialty Nat'l Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir. 1956)). The numerosity requirement imposes no absolute limitations; rather, it "requires examination of the specific facts of each case." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Thus, while the Supreme Court has noted that putative classes of 15 are too small to meet the numerosity requirement, *id.* at 330 & n.14, district courts in this Circuit have found that classes with as few as 39 members met the numerosity requirement, *see Patrick v. Marshall*, 460 F. Supp. 23, 26 (N.D. Cal. 1978); *see also Jordan v. L.A. County*, 669 F.2d 1311, 1320 (9th Cir.) (noting, in *dicta*, that the court "would be inclined to find the numerosity requirement . . . satisfied solely on the basis of [39] ascertained class members"), *vacated on other grounds*, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982).

Plaintiffs estimate that the number of visually impaired individuals who visit a Disney theme park each year exceeds 100,000 and may even exceed 1 million. Plaintiffs

reach this calculation in two different ways.  First, they cite data showing that 25.1 million people living in the United States, or approximately 8%, are visually impaired.[4] (Mot., Exs. J, L at 36.)  Plaintiffs estimate that in 2009 more than 47 million patrons visited the Walt Disney World Resort and more than 21 million patrons visited the Disneyland Resort.[5]  (Mot., Ex. I at 14.)  Thus, Plaintiffs estimate that 8% of Defendants' annual patrons—3.8 million persons at the Walt Disney World Resort and 1.7 million persons at the Disneyland Resort—are visually impaired.  (Mot. at 15.)

Plaintiffs also estimate the number of visually impaired Disney patrons using an alternative methodology.  Citing a draft version of a 2010 article for *Disney Files* magazine (Mot., Ex. R), Plaintiffs estimate that there are currently 60 million Americans claiming to have a long-term disability.  Plaintiffs thus estimate that 41% of disabled persons (25.1 million out of 60 million) are visually impaired.  Because Greg Hale, the "worldwide vice president of safety and accessibility for Disney World Parks and Resorts," stated publicly that the number of disabled patrons who visit Disney World is "well into the thousands every day" (Mot., Ex. K), Plaintiffs estimate that at least 410 daily visitors to the Walt Disney World Resort (41% of 1,000) are visually impaired.  Based on this estimate, Plaintiffs calculate that approximately 180 visually impaired visitors attend the Disneyland Resort each day given that the overall attendance at the Disneyland Resort is approximately 44% of the overall attendance at the Walt Disney World Resort.[6]  (Mot. at 15.)  These daily estimates correspond to annual estimates of

---

[4] The estimate of 25.1 million visually impaired persons is based on a 2008 National Health Interview Survey conducted by the U.S. Department of Health and Human Services ("HHS") that includes respondents who "have any trouble seeing, even when wearing glasses or contact lenses" as well as those who are "blind or unable to see at all."  (Mot., Ex. L at 37.)

[5] Plaintiffs base their attendance estimates on a market research report because Defendants have not provided actual attendance data.  (*See* Mot. at 14 n.6.)

[6] The Court calculates slightly different numbers than Plaintiffs due to apparent rounding errors.  To avoid confusion, the Court uses the numbers stated by Plaintiffs in their Motion.

150,000 and 66,000 visually impaired visitors, respectively, at the Florida and California resorts.

Defendants deride Plaintiffs' reliance on census data and statistics as "ambiguous or speculative." (Opp'n at 28 (quoting *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007).) To the contrary, courts routinely rely on census data and statistics to determine numerosity. *See Target*, 582 F. Supp. 2d at 1199 ("Plaintiffs have submitted evidence, based on U.S. Census data, that there are likely thousands of potential class members in the nationwide class based on the large number of people who are legally blind and use screen access software. . . . Courts . . . have repeatedly certified ADA classes like the one proposed here based on similar evidentiary showings."); *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 608 n.8 (N.D. Cal. 2004) ("[C]ensus data is frequently relied on by courts in determining the size of proposed classes." (brackets omitted) (quoting 1 Robert Newberg, *Newberg on Class Actions*, § 3:3 (4th ed. 2002)). Nonetheless, the Court shares Defendants' skepticism of Plaintiffs' methodology in kind if not in degree.

Plaintiffs implicitly rely on two doubtful postulates. First, Plaintiffs assume that the proportion of the general population with visual impairments is the same as the proportion of Disney visitors with visual impairments. Similarly, Plaintiffs assume that the proportion of disabled individuals with visual impairments is the same in the general population as at the Disney resorts. These assumptions may not be true.

Furthermore, Plaintiffs draw upon a draft version of an article from *Disney Files* magazine in estimating that 41% of disabled persons are visually impaired. The magazine cites no basis for its statistic that 60 million Americans claim a long-term disability. The e-mail accompanying the draft version indicates that it was being circulated "to ensure that we have our facts straight." (Mot., Ex. R at 1.) Thus, its accuracy is questionable.

Equally problematic, Plaintiffs are comparing apples to oranges in reaching a ratio of 41%. Plaintiffs are comparing persons who "have any trouble seeing," whether short-

term or long-term, with persons who have long-term disabilities.  These two statistics likely originate from two different data sources.  To the extent Plaintiffs are attempting to reach an estimate based on Defendants' own data, the Disney presentation that Plaintiffs discuss (Mot. at 14, Ex. S), which is itself based on different underlying data sources, estimates that of about 50 million Americans with disabilities, 3.5 to 4.5 million (7-9%) have visual disabilities.

Nonetheless, even this lower estimate suggests that at least 25,000 annual visitors to the Walt Disney World Resort and at least 11,000 annual visitors to the Disneyland Resort have visual disabilities.  Thus, in examining the putative class of visually impaired persons who were or will become patrons of the Disney resorts in California or Florida, the Court concludes that it is far too numerous to practicably join all members.

The Court's conclusion that joinder would be impossible or impracticable is bolstered by the fact that individual members of the putative class "are unknown and cannot be readily identified."  *Park v. Ralph's Grocery Co.*, 254 F.R.D. 112, 120 (C.D. Cal. 2008) (citing *Moeller*, 220 F.R.D. at 608).  It would be impossible to join all potential class members where there is no centralized source—such as a common employer—with records of the constituent members.

Defendants also assail Plaintiffs' calculations by pointing out that from May 1, 2005 through December 9, 2010, Defendants have received a total of only 58 visitor complaints regarding any of the issues raised in the putative class definitions from guests identifying themselves as visually impaired.[7]  (Opp'n at 26; Cohen Decl. ¶¶ 3-4, Ex. 25.) The Court agrees that this evidence is entitled to some weight.  Within the overarching group of visually impaired Disney visitors or potential visitors, the Court must determine whether each putative class is sufficiently numerous to support certification, *cf. Zinser v.*

---

[7] Defendants identify this evidence as "visitor complaints" from "visually impaired guests and guests with service animals."  (Cohen Decl. ¶¶ 2-3.)  This description is somewhat misleading as the documents contain not only complaints but also comments and positive feedback.  In addition, several of the comments appear to be from individuals who did not actually visit a Disney park.  For convenience, the Court refers to these documents as "visitor complaints" or "complaints."

*Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) ("Plaintiffs . . . bear the
burden of establishing appropriate subclasses and demonstrating that each subclass meets
the Rule 23 requirements." (quoting *In re Telectronics Pacing Sys., Inc.*, 168 F.R.D. 203,
221 (S.D. Ohio 1996))), and the visitor complaint data are the only evidence from which
to draw conclusions about the size of many of the classes.

Nonetheless, the low number of complaints over the period in question does not
uniformly suggest a lack of numerosity. Certainly not every deterred potential patron or
aggrieved guest—sighted or otherwise—will lodge a complaint. It is likely that only a
very small percentage of such guests actually take the time to do so, and it is impossible
to pinpoint this percentage based on the current record. Even if it were relatively large,
such as 10 to 20%, it would in most instances reflect a class sizeable enough to satisfy
Rule 23's numerosity requirement.

### a.   Individual Classes

Although Plaintiffs establish that there are sufficiently numerous visually impaired
Disney visitors or potential visitors as to support certification, they do not seek to certify
such an overarching class. Rather, Plaintiffs have narrowly defined each of their 10
proposed classes to include a subset of Disney visitors or potential visitors with a specific
grievance. Thus, while one of Defendants' recurring arguments against the certification
of each individual class is that few or no visitor complaints reflect Plaintiffs' precise
grievances, the issue that they raise is really one of numerosity. Given how narrowly
Plaintiffs draw their class definitions, such that their class-specific grievances inhere in
their proposed class definitions, it is virtually a foregone conclusion that Plaintiff's
claims are typical of each of these classes.

For some classes, the lack of complaints is dispositive. With respect to the
proposed Disney Character, Locker, and Parking classes, there is no evidence that these
issues affect any individuals other than Plaintiffs and Rick Boggs, Plaintiff Amber
Boggs' husband. (*See* Cohen Decl. ¶¶ 9, 15, 17.) Plaintiffs' personal experiences are
insufficient evidence for the Court to find that their complaints are widespread among a

certifiable class. *Cf. Dukes*, slip op. at 16 ("[O]ne named plaintiff's experience of discrimination [i]s insufficient to infer that 'discriminatory treatment is typical of [the defendant's] practices.'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982))); *Falcon*, 457 U.S. at 159 n.15 ("The mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common employer."). Other than the visitor complaints, Plaintiffs provide no evidence establishing numerosity in these classes, as is their burden in seeking certification. *See Dukes*, slip op. at 10 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties . . . .").

Plaintiffs assert that the Court "may make common sense assumptions to support the finding of numerosity." (Mot. at 12 (citing *Moeller*, 220 F.R.D. at 608; *Neiberger v. Hawkins*, 208 F.R.D. 301, 313 (D. Colo. 2002); 210 F.R.D. 27, 33 (E.D.N.Y. 2002); *Nat'l Org. of Disability v. Tartaglione*, No. CIV. A. 01-1923, 2001 WL 1258089, at *1 (E.D. Pa. 2001); *Colo. Cross-Disability Coal. v. Taco Bell Corp.*, 184 F.R.D. 354, 358 (D. Colo. 1999)).) To an extent, this is true. Thus, the Court recognizes that the number of visitor complaints to address a particular topic represents only a fraction of the number of potential class members affected by that issue. Nonetheless, where evidence of numerosity is entirely lacking, the Court cannot substitute its imagination—no matter how commonsensical—in place of facts.

The cases cited by Plaintiffs do not support certification based solely on a court's intuitions. In *Moeller*, the court relied on census data that 151,000 persons in California use wheelchairs and evidence that the defendant's restaurants had more than 50 million transactions in 2002 to conclude that "the only way that this class is not numerous is if virtually none of Defendant's fifty million transactions involved persons who use wheelchairs or scooters." 220 F.R.D. at 608. Thus, the court applied common sense only to draw statistical inferences *in light of evidence in the record*.

1    Similarly, Plaintiffs' other authority also involved situations where a court made
2    reasonable assumptions based on evidence in the record.  *See Neiberger*, 208 F.R.D. at
3    314 (relying on data that a Colorado mental health institute admitted between 650 and
4    700 patients per year and that the average daily census showed a population of 300
5    patients to conclude that the proposed class—all present and future persons committed to
6    the institute—was sufficiently numerous); *Tartaglione*, 2001 WL 1258089, at *2 (relying
7    on apparently uncontested allegations that the class contained approximately 184,500
8    members); *Colo. Cross-Disability Coal.*, 184 F.R.D. at 358 (relying on both survey
9    results and census data and demonstrating the existence of at least 27 class members).

10    Therefore, the proposed Disney Character, Locker, and Parking classes cannot be
11    certified.  The Court now turns to the remaining classes to determine whether they satisfy
12    the Rule 23 numerosity requirement.

13                    **b.    Signage Class**

14    At least twelve visitor complaints related to the putative Signage Class.  (Cohen
15    Decl. ¶ 10.)  Thus, the Court can reasonably infer that there are putative class members
16    other than the named Plaintiffs and their immediate families.  Given that the number of
17    visitor complaints is almost certainly a small fraction of the number of visually impaired
18    individuals who have been or will be affected by Defendants' signage policies, the Court
19    finds that this class is sufficiently numerous so as to make joinder impracticable.

20                    **c.    Map Class**

21    Plaintiffs seek to certify a class of visually impaired individuals who have not been
22    or who will not be provided with maps in alternative formats accessible to visually
23    impaired individuals.  None of Defendants' visitor complaints identify a lack of Braille or
24    large-type maps as a particular problem, although several suggest that adding a GPS
25    element into audio devices would be helpful in lieu of or in addition to existing maps.
26    (*See* Cohen Decl., Ex. 28 at 550 (asking Defendants to "[p]rovide [the] blind and partially
27    sighted with GPS accessible devices that map each theme park and the WDW complex");
28    *id*. at 552 ("GPS within the Parks could be very helpful . . . ."); *id*. at 556 ("I saw people

of all sorts using the Braille Maps for reference, but imagine adding that information to the audio description so a visually impaired visitor would know when they are near a Braille sign too . . . .").)

Thus, there is no evidence that the proposed Map Class would extend to visually impaired individuals other than the named Plaintiffs.  As Defendants' expert witness opined, only "a limited number of legally blind people use maps, even when presented in an alternative format such as Braille or large print," in part because such maps "must be so large to cover the same information contained in a print map that they are unwieldy and difficult to use."  (Pomerantz Decl. ¶ 13.)  Because the proposed Map Class fails to meet the numerosity requirement, the Court cannot certify this class.[8]

### d.     Kennel Class

The proposed kennel class members are persons who either have paid a kennel fee or have been deterred from visiting a Disney park because of (1) the kennel fee for service animals; (2) a lack of reasonable designated areas for service animals to defecate; or (3) Defendants' alleged policy forbidding service animals from being tied to any locations within the theme parks while the visually impaired owners use park rides. Plaintiffs seek to compel Defendants to "provide reasonable accommodations for service animals, designated places to defecate within Disney theme parks, hotels, restaurants, and shops . . . , and places where the service animal can be tied . . . while the visually impaired person uses rides."  (Compl. at 37.)  Plaintiffs further request that the Court "make a determination as to the propriety of the fees [Defendants] charge visually impaired visitors at Disney theme parks . . . for accommodations and auxiliary aids and services including kennels."  (*Id*. at 38.)

---

[8]  Moreover, Plaintiffs are not adequate representatives of the putative Map Class because they have little or no experience with Braille or large-type maps.  (*See* Shields Depo. at 41:21-24; Boggs Depo. at 86:5-6, 99:18-100:15, 105:12-106:1; Stockton Depo. at 55:2-57:24; 85:2-4, 86:23-87:8.) Plaintiffs do not identify any alternative formats for portable maps—aside from Braille, large type, and audio description devices—that they would use themselves such that they could adequately represent the proposed Map Class.  Accordingly, the Court cannot certify the Map Class.

There is no evidence that Plaintiffs' allegations about the kennel fee are shared by sufficiently numerous visually impaired individuals so as to make joinder impracticable. Among visitor complaints made to Defendants between May 1, 2005 and December 9, 2010, only one (other than a complaint made by Plaintiff Shields) addresses the propriety of the kennel fee. (*See* Cohen Decl., Ex. 29 at 585 ("[A] fifteen-dollar fee gets the dog a cage to lie down in while we're in the park enjoying ourselves. . . . [T]here are no discounts either for service animals or for annual passport holders. This strikes us as somewhat inflexible . . . .").)

Similarly, Plaintiffs' allegations with respect to Defendants' alleged tying policy—*i.e.*, forbidding service animals from being tied to any locations within the theme parks while visually impaired owners use park rides—are also not shared by enough other persons as to warrant certification of the proposed kennel class. No patron complaint directly mentions such a policy or requests the ability to tie a service animal to a location near a ride. Nor are visually impaired patrons likely to have such a grievance—the ADA regulations specifically prohibit the practice of leaving a service animal unattended. *See* 28 C.F.R. § 36.302(c)(4) ("A service animal shall be under the control of its handler."). In this respect, the merits of Plaintiffs' claim overlap with their Rule 23's requirements of numerosity and typicality.

Complaints from several Disney park-goers bemoan the inconvenience of the kennel's location at the park entrance and some suggest providing kennel or cage areas near individual rides (as is apparently the practice at some parks). (*See* Cohen Decl., Ex. 29 at 549, 578, 584-85, 587, 593.) While these complaints may arise from the same general grievance underlying Plaintiffs' goal of modifying Defendants' alleged tie-up policy—that the visually impaired need a place to leave their service animals so that they may enjoy certain rides that prohibit service animals—Plaintiffs' claim and the park-goer complaints are substantively different. Even if the Court were to reformulate Plaintiffs' proposed class definition *sua sponte* to include all visually impaired individuals needing to temporarily secure their service animals at rides, such a proposed class would not be

1    entitled to relief. "A public accommodation is not responsible for the care or supervision
2    of a service animal." 28 C.F.R. § 36.302(c)(5).

3         The final component of Plaintiffs' proposed kennel class is visually impaired
4    individuals who have been deterred from visiting a Disney park due to a lack of
5    reasonable designated areas for service animals to defecate. It appears that other visually
6    impaired individuals share Plaintiffs' concern. Several complaints express concern that
7    Disney parks do not provide acceptable locations for their service animals to defecate.
8    (*See* Cohen Decl., Ex. 29 at 549, 579-80, 581.)

9         Accordingly, the Court finds that certification of the proposed Kennel Class is
10   appropriate. Modification of the proposed class definition will be necessary, however, to
11   ensure that it meets both numerosity and typicality requirements. Thus, the Court
12   excludes from certification Plaintiffs' proposed definitions involving the kennel fees and
13   the alleged policy prohibiting animals from being tied-up near rides.

14                    **e.      Audio Description Device Class**

15        Plaintiffs seek to certify a class of visually impaired individuals who have or will
16   be deprived of the full use and enjoyment of Defendants' audio description device. At
17   least seven visitor complaints and 18 comments from visually impaired testers relate to
18   the putative Signage Class. (Cohen Decl. ¶¶ 18-19, Exs. 34-35.) Thus, the Court can
19   reasonably infer that the putative Signage Class members satisfy the numerosity
20   requirement.

21                    **f.      Companion Ticket Class**

22        Several complaints by visitors to Disney parks reflect Plaintiffs' concern that
23   Defendants do not offer free or reduced admission to companions of the visually
24   impaired. (*See* Cohen Decl., Ex. 30 at 622, 623, 624, 625, 626, 628, 629, 630, 631, 633.)
25   Therefore, the Court finds that Plaintiffs have borne their burden of demonstrating
26   numerosity with respect to the proposed Companion Ticket Class.

27

28

### g.    Parade Class

Plaintiffs' proposed Parade Class would encompass visually disabled persons "who have experienced discrimination, or who will upon future visits experience discrimination, due to Defendants' policy of excluding persons with disabilities, other than wheelchair users, from preferential locations to stand or sit during the parades and shows."  (1st Am. Compl. ¶ 18(g).)  Plaintiffs seek to enjoin this alleged policy.  (*Id*. at 38.)

There is evidence that visually impaired guests have complained about being denied seating in areas for the disabled at parades and shows.  (*See* Cohen Decl., Ex. 31 at 645-46, 649-50, 653, 658-59, 676-77, 683-84.)  This evidence suggests that there are sufficiently numerous visually impaired guests who have allegedly experienced discrimination at parades and shows as to make joinder impracticable.  Accordingly, Plaintiffs satisfy the numerosity requirement for the proposed Parade Class.

### h.    Website Class

The Court also finds that Plaintiffs make a sufficient showing of numerosity as to the proposed Website Class.  There is evidence that roughly 1.5 million visually impaired persons have regular access to the Internet (Mot., Ex. Q at 7) and that the Disney Parks websites had an aggregate of 2.96 million unique hits during December 2010 (Davis Depo. at 43:4-23).  In addition, Plaintiffs cite evidence that persons with disabilities do more planning and booking of accommodations via the Internet than persons in the general population.  (Mot., Ex. S at 14.)  Thus, the Court concludes that this potential class is sufficiently numerous as to make joinder impracticable.

## 2.    Commonality

The commonality requirement is satisfied if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'"  *Dukes*, slip op. at 9 (quoting *Falcon*, 457 U.S. at 157).  In determining that a common question of law exists, it is insufficient to find that all putative class members have suffered a violation of the

same provision of law. *Id.*   Rather, the putative class members' claims "must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Nonetheless, in conducting the commonality inquiry, one significant issue shared by the class may suffice to warrant certification. *Id.*, slip op. at 19 (quoting *id.*, slip op. at 10 n.9 (Ginsberg, J., dissenting)); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("All questions of fact and law need not be common to satisfy the rule.   The existence of shared legal issues with divergent factual predicates is sufficient . . . .").

Defendants do not argue that the proposed classes lack commonality other than to state that "Plaintiffs' inability to identify an ascertainable classes [sic] or appropriate classwide remedies . . . defeat a Rule 23(a)(2) showing of commonality."[9]  (Opp'n at 27 n.17.)  Relying entirely on district court cases, Defendants assert that Rule 23(a) contains an implicit requirement that a class be "ascertainable" in the sense of "precise" or "sufficiently definite."  (*Id.* at 13 (quoting *Whiteway v. FedEx Kinko's Office & Print Servs., Inc.*, No. C 05-2320 SBA, 2006 WL 2642528, at *3 (N.D. Cal. Sept. 14, 2006), and *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 416 (C.D. Cal. 2000)).)

Even if such a requirement exists when certification is sought under Rule 23(b)(2), the Court discerns no difficulty ascertaining the proposed classes here.  The group of "all visually impaired individuals" (*see* Opp'n at 25) is no more indefinite than, for instance, "all African-American Boeing employees," *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003) (affirming commonality finding), or "all persons who . . . have engaged, or may engage, in acts of private, consensual homosexual conduct," *Soc'y for Individual Rights, Inc. v. Hampton*, 63 F.R.D. 399, 401 (N.D. Cal. 1973) (certifying class under

---

[9] Defendants also make a cursory commonality argument with respect to the proposed Companion Ticket class.  (Opp'n at 38 n.26.)  The Court addresses this argument *infra*.

Rule 23(b)(2))—notwithstanding that it may be difficult or impossible to locate specific persons within this category. Nor is it material to the commonality inquiry that putative class members may have a variety of underlying causes contributing to their vision impairments. (*See* Opp'n at 5 & n.3.) To the extent variances within the class as to severity of vision impairment give rise to a multiplicity of remedies necessary to remedy the alleged ADA violations, the Court addresses this issue within the context of Rule 23(b)(2).

### a.   Signage Class

Plaintiffs identify the following common issues of law and fact for members of the putative Signage Class: (1) whether Defendants failed to provide Braille and/or large print signage and/or schedules within the Resorts so as to orient visually impaired patrons as to the locations of rides, restaurants and facilities as well as the times for shows; (2) whether Defendants failed to provide menus in accessible alternative formats such as Braille and/or large print; (3) whether Defendants' employees failed to read menus, in full, to visually impaired guests upon request; (4) whether Defendants' failed to train employees to read menus in full to visually impaired guests when there is a lack of a Braille and/or large print menus at the Resorts; and (5) whether these facts, if true, violated the ADA, CDPA, and/or Unruh Act. (Mot. at 27.) The Court finds that these common issues of fact and law meet the Rule 23(a)(2) requirement.

### b.   Kennel Class

With respect to the proposed Kennel Class, there are common issues of law and fact: (1) whether Defendants failed to designate reasonable areas for visually impaired guests' service animals to defecate within the Resorts; (2) whether Defendants were legally required to do so; (3) whether any such failure deterred visually impaired guests from visiting the Resorts; and (4) whether any such failure violated the ADA, CDPA, and/or Unruh Act. (*Id.* at 31.) These common issues also satisfy Rule 23(a)(2).

### c.   Audio Description Device Class

As for the proposed Audio Description Device Class, the Court finds that there are common issues of law and fact:  (1) whether Defendants' audio description device has a design defect that shuts off the device automatically such that a visually impaired user cannot reset it without returning the device to the guest services department; (2) whether any such defect renders the devices inaccessible to the visually impaired; and (3) whether the alleged inaccessibility violates the ADA, CDPA, and/or Unruh Act.  (*See* 1st Am. Compl. ¶ 51; Mot. at 33.)  Thus, this proposed class satisfies Rule 23(a)(2).

### d.   Companion Ticket Class

Plaintiffs maintain that the following issues of law and fact exist with regard to the proposed Companion Ticket Class:  (1) whether Defendants are legally required to provide a free or discounted ticket to the aide or companion of a visually impaired guest to the Resorts as a reasonable accommodation; (2) whether Defendants are legally required to provide a Disney employee to act as a companion or aide to visually impaired guests at the Resorts; and (3) whether Defendants' practice of requiring visually impaired guests to purchase an additional ticket, at full price, for a companion or aide to assist them utilize the accommodations at the Resorts violates the ADA, CDPA and/or Unruh Act. (Mot. at 35-36.)  These issues satisfy the commonality requirement.

### e.   Parade Class

There is an issue of law and fact common to members of the proposed Parade Class:  whether Defendants maintained a policy at parades and shows allowing only wheelchair users and not guests with other disabilities such as visual impairments to use the areas designated for handicapped guests; and whether such a policy violates the ADA, CDPA and/or Unruh Act.  Thus, the proposed Parade Class also satisfies Rule 23(a)(2). (*Id*. at 37.)

### f.   Website Class

Lastly, the putative Website Class also involves questions of law and fact common to all class members:  whether Defendants maintain one or more websites that are not

-24-

fully accessible for persons with visual impairments utilizing screen reader software which prevents visually impaired persons from enjoying equal access to the Defendants' theme parks, hotels, restaurants and stores and the numerous goods, services and benefits offered to the public through such websites; and whether any such inaccessibility violates the ADA, CDPA, and/or Unruh Act.  (*Id.* at 42-43.)  These common issues of law and fact satisfy Rule 23(a)(2).

### 3.     Typicality

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class."  *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Id.* (quoting *Hanon*, 976 F.2d at 508).  The typicality standard under Rule 23(a)(3) is "permissive":  "representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957 (quoting *Hanlon*, 150 F.3d at 1020).

Defendants argue that Plaintiffs' alleged experiences are atypical because Disney has received numerous awards from disability organizations, its employees have had many positive experiences with putative class members, and Plaintiffs admit to having had positive interactions with Disney characters while accompanied by their service animals.  (Opp'n at 6.)  These types of arguments primarily address the merits of Plaintiffs' claims, which the Court does not consider other than where they necessarily overlap with class certification considerations.  Thus, these arguments largely miss the mark.  The issue under Rule 23(a)(3) is not whether there has been a uniform failure to provide reasonable accommodation at all.  Rather, it is whether the inaccessibilities

experienced and accommodations sought by Plaintiffs are typical of those experienced and sought by putative class members generally.

> a.     **Signage Class**

Defendants maintain that Plaintiffs have atypical claims because their "apparent preference for certain formats of printed materials simply does not reflect the spectrum or particularity of the needs, preferences, and requests of the absent class members, which . . . vary widely." (Opp'n at 31.)  It is not clear how Plaintiffs' claims are atypical. Plaintiffs seek signage, schedules and menus in "alternative formats *such as* Braille and/or large print." (1st Am. Compl. at 37 (emphasis added).)  Plaintiffs stress in their Reply that they are seeking relief in the form of alternative formats for menus, schedules, and maps. (Reply at 3.)

The fact that each Plaintiff has at least some degree of proficiency in Braille does not make her claims atypical.  For example, with regard to menus, all three Plaintiffs testified at their depositions that they sometimes prefer to have menus read to them by waitstaff. (Shields Depo. at 150:7-20; Boggs Depo. at 46:15-20, 47:9-15; Stockton Depo. at 152:3-12.)  Although Plaintiff Shields has never had a server refuse to read her a menu (Shields Depo. at 146:7-9), Plaintiffs Boggs and Stockton have had such experiences. (Boggs Depo. at 266:23-267:1; Stockton Depo. at 154:19-155:11.)

That Plaintiffs sometimes prefer the server to read from specific parts of the menu or focus on specific types of menu items and sometimes prefer to have the entire menu read does not make their claims atypical.  The concern is that the waitstaff refuse to read the parts of the menu that Plaintiffs request to have read to them—not that the waitstaff refuse to read the menus in a particular way.  In this respect, Plaintiffs Boggs and Stockton have claims regarding the menu that are typical to visually impaired guests who have lodged complaints. (*Compare, e.g.*, Boggs Depo. at 266:25-267:1 (describing situation where waiter "said he didn't have time to read the whole menu"), *with* Cohen Decl., Ex. 27 at 540-41 ("Not many people are willing to go through a menu with you, because they are in too much of a hurry to get you in and out of there to make room for

the next customers.").)  Therefore, the Court finds that Plaintiffs' claims are typical of the proposed Signage Class.

### b.    Kennel Class

The Court also finds that Plaintiffs' claims are typical of the proposed Kennel class.  Like their fellow putative class members, Plaintiffs are visually impaired individuals who have been deterred from visiting the Disney theme parks because they claim there are no reasonable designated areas for service animals to defecate.

Defendants' assertions that they "*do* designate areas within their theme parks for service animal relief" and that they allow relief "in any open area" (Opp'n at 34) are beside the point.  Although these assertions, if true, may be relevant to the merits of Plaintiffs' claims, they are immaterial to the typicality of Plaintiffs' claims.  Defendants' contention that "absent class members have commended [Disney] on its accessibility for guests with service animals, including several compliments about cast members assisting guests in finding the service animal relief areas" (*id*. (citation and parenthesis omitted)), actually supports a typicality finding.  The fact that guests have required assistance in finding the service animal relief areas suggests that the relief areas may not be in reasonable locations.

In any event, visually impaired Disney guests who have no discontent about the location of the service animal relief areas are unlikely to be deterred from visiting the Disney theme parks on account thereof.  Thus, by definition, the putative class does not include such individuals.  Accordingly, Plaintiffs Shields and Stockton have claims that are typical of the proposed Kennel Class.

### c.    Audio Description Device Class

Defendants challenge certification of the audio description device class on typicality grounds.  (Opp'n at 36-37.)  Plaintiffs allege that Defendants' audio description device has a design defect such that, once it shuts off automatically, "a visually impaired

1 user cannot re-set the device and must return to the guest services department to have it

2 re-set."[10]  (1st Am. Compl. ¶ 51.)

3           The Court agrees with Defendants that the current record does not reflect that

4 Plaintiffs' claims are typical of visually impaired individuals who have used or have

5 attempted to use Defendants' audio description device "and [have] been deprived of the

6 full use and enjoyment of the device."  (Compl. ¶ 12.)  As discussed above, several

7 complaints identified the lack of a GPS-based element in the audio description devices as

8 an issue.  Other complaints cited, *inter alia*, the high cost of the security deposit (Cohen

9 Decl., Ex. 34 at 717), reported that the device did not work at all (*id*. at 715, 718-19, 721;

10 *id*., Ex. 35 at 754), requested the availability of audio descriptions in foreign languages

11 (*id*., Ex. 34 at 722), requested a fuller audio description of particular attractions or

12 restaurants/menus (*id*. at 723-24; *id*., Ex. 35 at 727, 732), fulminated against the device's

13 short cord (*id*., Ex. 34 at 726), expressed a need for a pause or an on/off button (*id*., Ex.

14 35 at 728, 729, 735, 757), asked for a means of attaching the device to one's waist or

15 rendering it hands-free (*id*. at 727, 729, 730, 732, 734, 735, 757, 758), commented that

16 the device's audio is sometimes drowned out by ambient noise (*id*. at 737, 744, 539), or

17 criticized employees' knowledge of the devices (*id*., Ex. 34 at 715, 718-19, 721, 724; *id*.,

18 Ex. 35 at 754).   Only one complaint regarding the audio description device even

19 mentioned an issue with being unable to reset the device unassisted after it had shut off.

20 (*See id*., Ex. 34 at 724.)

21           Although one could argue that each one of these complaints arguably reflects an

22 individual who has "been deprived of the full use and enjoyment of the device" (Mot. at

23 6) and therefore fall within the class definition, that is simply another way of arguing that

24 such individuals have suffered an ADA violation.  The Supreme Court made clear in

25 *Dukes* that it is not enough that putative class members "have all suffered a violation of

---

[10] None of the relief that Plaintiffs demand in their First Amended Complaint would remedy this
alleged defect or even relates to Defendants' audio description device.  (*See* 1st Am. Compl. at 36-39.)

the same provision of law." *Dukes*, slip op. at 9.  Thus, this Court found commonality among members of Plaintiffs' proposed Audio Description Device Class based on Plaintiffs' claim that the device has a design defect that shuts it off automatically and prevents a visually impaired user from resetting the device except by returning it to the guest services department.  (*See* Compl. ¶ 51.)  This claim, however, is not typical of other visually impaired individuals who have allegedly been deprived of the full use and enjoyment of the audio description device.  Consequently, on the current record, the Court cannot certify this class.

### d.    Companion Ticket Class

Plaintiffs seek to certify a class of visually impaired individuals "who will upon future visits be required to pay for, an additional ticket for a companion or aide to assist the visually impaired individual to utilize the accommodations" at Disney parks.  (1st Am. Compl. ¶ 18(f).)  Plaintiffs claim that Defendants violate the ADA, CDPA, and/or Unruh Act by "not providing an employee to assist a visually impaired person," which "forces a visually impaired person to bring and pay full price for a companion to fully utilize the park facilities."  (*Id.* ¶ 53.)  Although it is not clear, Plaintiffs apparently also maintain that Defendants violate the law by failing to "provide a free or discounted ticket to the aid or companion of a visually impaired visitor to the theme parks as a reasonable accommodation."  (*Id.* ¶ 24(j) (setting forth legal issues common to the class).)

Defendants assert that Plaintiffs Shields and Boggs' claims are not typical of other potential class members because "some guests have asked for companion admission" whereas "others have asked for discounted admission for themselves or for their companion."[11]  (Opp'n at 37.)  Defendants are splitting hairs.  The central question presented by this class is whether visually impaired individuals who bring a companion to help them fully benefit from the Disney experience are required to pay the full cost of

---

[11] Defendants submit—and, as discussed below, the Court agrees—that Plaintiff Stockton is an inadequate representative for this class.

-29-

1  two admissions or whether some sort of financial accommodation is or should be offered.

2  Whether such an accommodation takes the form of a free admission or merely a

3  discounted ticket and whether it applies to the visually impaired individual, the

4  companion, or both, is not material to the underlying claim.  It is a question pertaining

5  only to the appropriate remedy.  Thus, the Court concludes that Plaintiffs' claims are

6  typical of the proposed Companion Ticket Class.

7                          e.      **Parade Class**

8          Plaintiffs have claims that are typical of other putative Parade Class members.

9  Plaintiffs claim that, due to Defendants' alleged policy, they were denied seating in or

10 access to preferential locations for viewing parades and shows because they were not in

11 wheelchairs.  Other visually disabled visitors to the Disney theme parks have expressed

12 similar complaints.  (*See, e.g.*, Cohen Decl., Ex. 31 at 645 (complaining that a female

13 employee stated that "the front was reserved for individuals in wheelchairs and no one

14 else" and that the complainant's visually impaired daughter "was not considered disabled

15 unless she was in a wheelchair"); *id*. at 653 (describing situation where guest and his

16 blind wife sat in the disabled section but "were rudely told by a cast member to move to

17 the upper section of the stadium" because the disabled section was "reserved for

18 wheelchair clients"); *id*. at 658-59 (opining that Disney "bends over backwards if you use

19 a wheelchair, but there is a lack of services provided to people who are visually

20 impaired" based on experience where she and her husband had a "problem obtaining a

21 special pass" that would have allowed them "to be seated in the front and center of the

22 shows").)  Accordingly, the Court finds that Plaintiffs' claims are typical of the Parade

23 Class.

24                          f.      **Website Class**

25         In the final remaining proposed class, Plaintiffs move to certify a group of visually

26 impaired individuals "who have been or who will in the future be unable to access one or

27 more of the websites maintained by Defendants such as www.disney.go.com and were or

28 will be denied equal access to Defendants' theme parks, hotels, restaurants and stores and

the numerous goods, services and benefits offered to the public through Defendants' websites." (1st Am. Compl. ¶ 18(i).)

Defendants challenge the typicality of Plaintiffs' claims, maintaining that Defendants' only contribution to the Disney theme parks' websites— www.disneyland.com, www.disneyworld.com, and www.disneyparks.com—is that Disney Online provided Walt Disney Parks and Resorts Online the option to use its "chrome" (navigation bar) and "footer" (links at the bottom of the page). (Opp'n at 40.) Defendants contend that Plaintiffs have atypical claims because they have not had problems with these specific features of the websites.

Plaintiffs, however, are not challenging these specific features. To the extent Defendants claim that they are not responsible for any other web content related to Disney theme parks, their argument is more accurately characterized as one of lack of standing. *See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974))). As discussed above (*see supra* note 3), the current record is insufficient to resolve a challenge to Plaintiffs' standing as to Defendant Disney Online. Thus, the Court defers ruling on this issue until presented with a properly supported motion.

In fact, Plaintiffs' alleged problems with the website are typical of the complaints that Defendants have received. Plaintiff Shields uses screen reading software and has been unable at times to access Disney websites. (Shields Depo. at 33:7-15, 35:21-36:10.) Plaintiff Boggs has used six different types of screen reading software and has had problems accessing a variety of information on the Disney websites. (Boggs Depo. at 49:8-23, 88:24-89:25, 177:8-16, 178:2-6, 178:18-23, 180:1-6.) Plaintiff Stockton also uses a screen reading device on her computer and has had problems accessing information on the Disney websites. (Stockton Depo. at 35:4-7, 77:12-79:25.)

Defendants received similar complaints regarding their website. (*See* Cohen Decl., Ex. 32 at 690 (describing "many issues with the reservations website"); *id*. at 694 (inquiring whether "things have changed especially with the waltdisneyworld.com so that I can make reservations on my own, and not have problems accessing anything on the website"); *id*. at 702 (commenting on how Disney's "website isn't accessible to the visually impaired"); *id*. at 705 ("[T]he calendar is unusable now for those of us who are blind and use screen readers. It consists of unlabeled flash content.").)

As Plaintiffs' claims regarding the Disney websites are typical of the claims by the proposed class, Plaintiffs satisfy Rule 23(a)(3).

### 4.    Adequate Representation

Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Class representation is inadequate if the named plaintiff fails to prosecute the action vigorously on behalf of the entire class or has an insurmountable conflict of interest with other class members." *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010) (citing *Hanlon*, 150 F.3d at 1020); *see also Dukes*, slip op. at 8 n.5 (explaining that while the adequacy of representation inquiry tends to merge with questions of typicality and commonality, it is distinct insofar as it "raises concerns about the competency of class counsel and conflicts of interest").

The Court finds that, in general, the named plaintiffs and class counsel adequately represent the putative classes and will continue to do so. Throughout this litigation, the named plaintiffs have demonstrated their willingness and ability to vigorously prosecute the claims at issue. For instance, they have (1) met with counsel before this suit was filed; (2) reviewed and executed contingency fee agreements; (3) reviewed and provided comments to their attorneys on the original complaint before it was filed; (4) worked with their families to retrieve documents and provide them to counsel to use in responding to requests for production; (5) agreed to allow their personal information to be used to support the class allegations; (6) participated in numerous telephone conferences and

correspondence with their attorneys regarding case status, interrogatories, requests for production, depositions, and in preparation for settlement negotiations should they occur; and (7) prepared, reviewed, revised and executed responses to interrogatories. (Dogali Decl. ¶ 25.)

In addition, the named plaintiffs' interests generally align with each of the classes that they wish to represent and they have no interests that are antagonistic to other potential class members. (*Id*. ¶ 24.) The putative class counsel also have no antagonistic interests and have adequate qualifications and experience to act as class counsel. They have experience in class actions and complex litigation, including civil rights and ADA litigation. (*See id*. ¶¶ 8-21; Feldman Decl. ¶¶ 3-8.)

Defendants assert that Plaintiffs Boggs and Shields are inadequate representatives for any of the 10 classes because they have a conflict. (Opp'n at 31 n.21.) Specifically, Defendants represent that Plaintiffs Boggs and Shields have threatened claims against a related Disney company, Disney Cruise Line, in connection with a cruise they took in January 2011. According to Defendants, Plaintiffs Boggs and Shields sought modification and aid (including re-designation of service animal relief areas, written materials in alternative formats, and other accommodations) and expressed displeasure with Disney Cruise Line's response, thus raising the prospect of future claims. (Raizman Decl. ¶ 11, Ex. 14.)

It is unclear how Plaintiffs' threatened (or actual) litigation against a separate legal entity would present a conflict in the present litigation. If anything, their willingness to bring claims similar to those in this lawsuit against another company demonstrates Plaintiffs' commitment to these issues. Thus, this evidence underscores Plaintiffs' adequacy as class representatives.

Defendants also claim that the putative class counsel has at least the appearance of "undue entanglement" with Plaintiffs Boggs and Shields because Mr. Feldman represents these plaintiffs not only in connection with the nascent Disney Cruise Line dispute, but has represented Plaintiff Boggs or her husband in at least three other actions. (Opp'n at

31 n.21.)  Defendants cite evidence of three such lawsuits.  The first, which the parties
settled, involved allegations that a college denied Plaintiff Boggs the right to apply based
on her disability.  (Boggs Depo. at 16:3-18:7.)  The second suit is a class action suit
against Southern California Gas Company over allegations that it does not provide bills
in an alternate format.  (*Id*. at 20:7-22:11.)  In the third matter, Plaintiff Boggs retained
counsel in regard to complaints she had about the manner in which Disney Cruise Lines
treated her while she was planning a cruise, although she had no intent to sue Disney
Cruise Lines over this issue.  (*Id*. at 306:20-310:11.)

In Defendants' view, these facts "raise questions about the appearance of putative
class counsel's competing loyalties to Ms. Boggs and Ms. Shields, on the one hand, and
the remainder of the class, on the other."  (Opp'n at 31 n.21.)  It is unclear how Plaintiff's
claims against a utility company, former claims against a college, and potential claims
against a cruise line have anything to do with the instant litigation.  Absent evidence that
Plaintiffs' counsel have abdicated their duties to class members in favor of named
Plaintiffs in any of these prior cases, the Court is not inclined to speculate as to the
existence of any conflict of interest.

Accordingly, the Court finds that Plaintiffs do not have conflicts of interest with
any of the proposed classes and are represented by qualified and competent counsel.
Thus, Plaintiffs satisfy Rule 23(a)(4).  Defendants proffer several class-specific reasons
why Plaintiffs do not adequately represent the proposed classes.  The Court addresses
these arguments below.

### a.    Signage Class

Defendants contend that Plaintiffs are inadequate representatives of the Signage
Class, in essence, because their claims are atypical of other putative class members.
(Opp'n at 31-32.)  The Court has considered and rejected this argument above in the
context of typicality.  Defendants point out that Plaintiff Shields has never had a server
refuse to read her a menu.  (*See* Shields Depo. at 146:7-9.)  Although this is true, there is
no reason that Plaintiff Shields cannot adequately represent this class based on her

experiences involving an alleged lack of signage and schedules in alternative formats. Thus, the Court finds that Plaintiffs are adequate representatives of the proposed Signage Class.

### b.    Kennel Class

Plaintiff Boggs does not seek to represent the proposed Kennel Class.  (*See* 1st Am. Compl. ¶ 20.)  Defendants' arguments as to why Plaintiffs Shields and Stockton are inadequate representatives of this class relate to those aspects of the class which the Court declines to certify because they lack numerosity and/or typicality.  In fact, both Plaintiff Shields and Plaintiff Stockton complain about the lack of reasonable places for their service animals to defecate.  (Shields Depo. at 106:2-18 (finding only a "little teeny tiny area" that was "most away from the public as possible" to relieve her service animal and being told by an employee that she needed "to take him to the kennels in the front of the park" even though her dog "can't wait to go to the bathroom there"); Mot., Ex. F at Resp. #16 ("[T]he lack of reasonable places for my service animal to defecate has impacted me by having to ask my sighted husband to locate a place for my service animal to defecate.").)  Therefore, the Court finds that Plaintiffs Shields and Stockton satisfy Rule 23(a)(4) with respect to the proposed Kennel Class.

### c.    Companion Ticket Class

Defendants depict Plaintiffs as inadequate representatives of the putative Companion Ticket Class by pointing out that Plaintiffs have never "visited the theme parks with a paid, sighted companion or with anyone other than a friend or family member who assisted them, and who also enjoyed the amenities of the park." (Opp'n at 37.)  Defendants thus attempt to distinguish a claim that "a medically necessary companion should receive free admission" from a claim that friends and family of visually impaired persons should receive free admission.  (*Id.* at 37-38.)

The distinction between paid and unpaid companions is neither made by Plaintiffs nor found in the regulations implementing the ADA.  *See, e.g.*, 28 C.F.R. § 36.303(c)(2) ("A public accommodation shall not require an individual with a disability to bring

another individual to interpret for him or her."); *id.* § 36.303(c)(3) ("A public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication, except . . . (ii) Where the individual with a disability specifically requests that the accompanying adult interpret or facilitate communication, the accompanying adult agrees to provide such assistance, and reliance on that adult for such assistance is appropriate under the circumstances."). Thus, the distinction is immaterial to the legal issue.

Each time that Plaintiff Shields asked if her sighted companion or caregiver could enter the Disney park for free, she was told no. (Shields Depo. at 206:11-22.) Plaintiff Boggs has also asked if a sighted companion could accompany her in a Disney park for free or, alternatively, if a Disney could provide an escort to guide her through the park, and both requests were refused. (Boggs Depo. at 278:2-279:8.) In fact, Plaintiff Boggs purchased an additional annual pass to accommodate companions and aides during her visits to the Disneyland Resort. (Boggs Depo. at 113:24-114:6; Mot., Ex. E at Resp. #14.)

The Court disagrees with Defendants that Plaintiff Stockton is an inadequate representative. She was required to purchase a ticket for her husband when he accompanied her to the Disney World Resort (Mot., Ex. F at Resp. #19) and thus meets the class definition. The fact that she never thought to ask whether a sighted person could accompany her into a Disney park for free does not preclude her from being an adequate class representative as her interest and injury are the same as those of all affected class members. (Stockton Depo. at 103:20-104:4.) Based on the evidence presented, the Court finds that each of the Plaintiffs will adequately represent the proposed Companion Ticket Class.

### d. Parade Class

The Court agrees with Defendants that Plaintiff Shields is not an adequate representative of the proposed Parade Class. Nothing in the record suggests that Plaintiff Shields has ever been denied access to disabled seating areas at parades or shows based

-36-

on her having a visual disability rather than one requiring a wheelchair. Plaintiff Shields has only twice attempted to sit in a wheelchair area at a parade. (Shields Depo. at 189:23-190:13.) On one occasion she was accommodated and on another she was not as the area was already full. (*Id.* at 190:18-19, 191:11-13.) The only time that Plaintiff Shields describes being denied access to disabled seating at a show, the denial was because she did not have the appropriate pass—not due to her lack of a wheelchair. (*See id.* at 214:7-13.)

Plaintiffs Boggs and Stockton, in contrast, are adequate representatives of this proposed class. Plaintiff Boggs reports attempting to gain access to disabled seating at a parade and being denied access because the area "was designated for wheelchairs only." (Boggs Depo. at 136:25-137:1.) Plaintiff Stockton once tried to gain access to a particular viewing area at a parade and was turned away because it was for wheelchairs. (Stockton Depo. at 134:13-17.)

With respect to *shows*, however, neither Plaintiff Boggs nor Plaintiff Stockton provides evidence that she has been excluded from a disabled seating area because she was not in a wheelchair. Thus, although these plaintiffs satisfy the typicality and adequacy requirements with respect to parades, they, like Plaintiff Shields, cannot serve as representatives of a class involving shows. Therefore, the Court finds certification of the Parade Class inappropriate as to shows.

### e. Website Class

Defendants assert that Plaintiffs' ability to acquire via other means the services and information that Plaintiffs sought on Defendants' websites makes Plaintiffs inadequate representatives of the proposed Website Class. (Opp'n at 40.) This argument goes to the merits of Plaintiffs' claims rather than to their adequacy as representatives and the Court need not address it here. *See Target*, 452 F. Supp. 2d at 956 (refusing to consider in online retailer's motion to dismiss its "affirmative defense" that it "need not modify its website, so long as it provides the information contained therein in some other format, such as by telephone").

1   Plaintiffs Shields, Boggs, and Stockton have each attempted to access one or more
2   of Defendants' websites, and the goods, services and benefits that those websites offer,
3   but have been unable to do so.  (Shields Depo. at 35:21-36:10; Boggs Depo. at 177:8-
4   178:17, 181:15-182:12, 183:1-17; Stockton Depo. at 77:12-79:25.)  Therefore, the Court
5   concludes that Plaintiffs will adequately represent the putative Website Class.

6       **5.      Rule 23(b)(2) Requirements**

7       Classes may be certified pursuant to Rule 23(b)(2) if "the party opposing the class
8   has acted or refused to act on grounds that apply generally to the class, so that final
9   injunctive relief or corresponding declaratory relief is appropriate respecting the class as
10  a whole."  Fed. R. Civ. P. 23(b)(2).  Class certification under Rule 23(b)(2) is possible
11  only when declaratory or injunctive relief is sought.   Rule 23(b)(2) certification is
12  available for monetary relief, if at all, only when such relief is incidental to the injunctive
13  or declaratory relief.  *Dukes*, slip op. at 20.  Civil rights actions against parties charged
14  with unlawful, class-based discrimination are "prime examples" of Rule 23(b)(2) cases.
15  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689
16  (1997); *see also Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998) (explaining that
17  Rule 23(b)(2) "was adopted in order to permit the prosecution of civil rights actions").

18      In determining whether certification is appropriate under Rule 23(b)(2), a court
19  must "look at whether class members seek uniform relief from a practice applicable to all
20  of them."  *Rodriguez*, 591 F.3d at 1125.  "The fact that some class members may have
21  suffered no injury or different injuries from the challenged practice does not prevent the
22  class from meeting the requirements of Rule 23(b)(2)."  *Id.* (citing *Walters*, 145 F.3d at
23  1047).  Claims for individualized relief, in contrast, do not satisfy Rule 23(b)(2).  This
24  subsection "applies only when a single injunction or declaratory judgment would provide
25  relief to each member of the class.  It does not authorize class certification when each
26  individual class member would be entitled to a *different* injunction or declaratory
27  judgment against the defendant."  *Dukes*, slip op. at 20.

28

As Plaintiffs point out, this case is a civil rights action where each of the proposed classes complain of classwide discrimination by Defendants for allegedly failing to accommodate visually impaired guests at their parks, restaurants, resorts and websites. (Mot. at 20.)  The relief sought by each of the proposed classes is exclusively declaratory and injunctive.  Certification under Rule 23(b)(2) is thus presumptively appropriate for each of the proposed classes.

Defendants dispute that certification under subsection (b)(2) is appropriate.  They contend that, as a general matter, "[t]he essence of the [ADA] . . . is that such claims must be raised, evaluated, and ultimately resolved individually, case-by-case." (Opp'n at 1; *accord* Opp'n at 16-18.)  To the contrary, courts regularly certify classes under Rule 23(b)(2) in actions pursuant to Title III of the ADA.  *See, e.g.*, *Park*, 254 F.R.D. at 123 (certifying class seeking structural modifications at more than 90 separate supermarket locations); *Target*, 582 F. Supp. 2d at 1209 (certifying class of "all legally blind individuals in the United States who have attempted to access Target.com and as a result have been denied access to the enjoyment of goods and services offered in Target stores").

Thus, the Court disagrees with Defendants that certification of ADA and related state law claims is *per se* inappropriate under subsection (b)(2).  Rather, the propriety of certification must be determined on a class-by-class basis.  Defendants nonetheless maintain that each of Plaintiffs' proposed classes fail to meet the Rule 23(b)(2) standard because they would require disparate remedies among various class members.  (*See* Opp'n at 16-24.)  The Court turns to consider this argument in the context of each of the remaining classes.

### a.    Signage Class

Defendants assert that the proposed Signage Class fails to satisfy Rule 23(b)(2) because its members have a wide variety of needs and preferences for aid or modification to their existing facilities and policies.  (Opp'n at 19-20.)  Defendants cite evidence that fewer than 10% of the legally blind in the United States read Braille and that, of those

1 who do, many may prefer different means of receiving particular communications.

2 (Raizman Decl., Ex. 20; Pomerantz Decl. ¶ 12.)

3          The variety of communication preferences among the visually impaired is not fatal

4 to certification.  An injunction applicable to all class members could include multiple

5 remedial measures to remedy the violation of a common right.  *See Walters*, 145 F.3d at

6 1049 (recognizing "that the individual elements [of an injunction] are intended to work

7 together in order to remedy the demonstrated constitutional violations").  A reasonable

8 accommodation might entail, by way of example only, the provision of signage, menus,

9 and schedules in large type and Braille, the availability of similar information via a GPS-

10 based audio description device, a pre-recorded telephonic synopsis of the menu, and a

11 requirement that employees read menus in full upon request.  At this stage of the

12 proceedings, however, there is no need to conduct a mini-trial as to which potential

13 remedies constitute reasonable accommodations.  It suffices to say that the necessity of

14 providing multiple ameliorative measures within a single injunction does not preclude

15 certification of the Signage Class.

16          Here, Plaintiffs seek injunctive relief that would apply to the entire class to address

17 alleged practices by Defendants that apply to all class members.  Accordingly,

18 certification under Rule 23(b)(2) is appropriate.

19                    **b.     Kennel Class**

20          The proposed Kennel Class, as modified by the Court, is also appropriate for

21 certification under subsection (b)(2).  Plaintiffs seek an injunction to remedy Defendants'

22 alleged failure to provide reasonable areas for service animals to defecate, an alleged

23 practice that applies to all putative class members.  The provision of additional or better-

24 placed areas for service animals to relieve themselves is relief that will apply to all class

25 members.  Thus, the requirements of subsection (b)(2) are met.

26                    **c.     Companion Ticket Class**

27          It is unclear whether Defendants maintain that the proposed Companion Ticket

28 Class does not satisfy Rule 23(b)(2).  (*Compare* Opp'n at 19 ("Each of Plaintiffs'

putative classes fails to satisfy Rule 23(b)(2)."), *with* Opp'n at 24 ("[N]ine of the ten putative classes in Plaintiffs' Complaint [excluding the Companion Ticket Class] simply do not qualify for class treatment under Rule 23(b)(2).").)  In any event, the Court finds that it does.

Members of the putative Companion Ticket Class seek an injunction to remedy Defendants' alleged refusal to provide free or discounted tickets to sighted companions or aids who accompany visually impaired visitors to the Disney theme parks.  Because this practice applies to all class members, as would the relief sought, certification is appropriate.

### d.   Parade Class

With respect to the proposed Parade Class, Defendants argue that certification is foreclosed due to class members' "widely variable visual capacities."  (Opp'n at 21.) Thus, Defendants conjecture that "some putative members of the Parade Class will have no need for or interest in front row seating for a parade or show, while others may definitely benefit from a front row."  (*Id*.)

To the contrary, this class would seek an injunction to remedy Defendants' purported policy of excluding visually impaired individuals—other than those in wheelchairs—from preferential areas reserved for individuals in wheelchairs.  Thus, the desired injunction would apply uniformly to class members and would remedy an alleged policy that affects all class members.  Defendants' argument that not all class members would benefit from an injunction addresses typicality rather than the requirements of subsection (b)(2).  Yet, such an argument fails because visually impaired persons who do not need access to preferential seating areas are not discriminated against and thus do not fall within the class definition.

The Court finds that the Rule 23(b)(2) requirements are met by the proposed Parade Class.

1

          **e.**      **Website Class**

2          Lastly, in opposition to certification of the Website Class, Defendants assert that

3 "there is no accepted accessibility standard" and points out that the Department of Justice

4 "is yet to determine which standards would apply to websites."  (Opp'n at 22.)  These

5 arguments, which concern typicality and commonality, are not relevant considerations

6 under Rule 23(b)(2).  Moreover, they are unpersuasive even in those contexts.  The lack

7 of a widely accepted standard for website accessibility does not preclude injunctive relief

8 that would improve access to Defendants' websites by the visually impaired.  Indeed,

9 nearly three years ago—presumably when website accessibility standards were even less

10 settled—*Target* certified a class of "[a]ll legally blind individuals in the United States

11 who have attempted to access Target.com and as a result have been denied access to the

12 enjoyment of goods and services offered in Target stores."  582 F. Supp. 2d at 1191.

13                Target also attacks the proposed class on the basis that the class members'

14                claims are widely divergent, depending on the members' different skill

15                levels with the internet; the type of technology they use; and which parts of

16                the website they attempted to access.   These arguments are unavailing.

17                Some degree of individuality is to be expected in all cases, but that

18                specificity does not necessarily defeat typicality.  In most cases involving

19                access under the ADA, there will be individual variations among class

20                members in terms of the nature of their disability, the types of aides used,

21                and the individual nature of each class member's encounters with the

22                website and access to services and facilities.

23 *Id*. at 1201 (internal quotation marks and citations omitted).

24          For Rule 23(b)(2) purposes, the relevant questions are whether class members seek

25 uniform relief and whether the relief remedies a practice applicable to all class members.

26 *Rodriguez*, 591 F.3d at 1125.   The putative Website Class meets these requirements.

27 Therefore, Plaintiffs are entitled to certification of this class.

28

# V.

## CONCLUSION

In light of the foregoing:

1.     Plaintiffs' Motion for Class Certification is **GRANTED** in part.  The Court certifies the following classes:

   a.     **SIGNAGE CLASS**:  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102, who have not been or upon visiting in the future will not be provided signage, menus, or schedules in an alternative format, such as Braille and/or large print, or who were not read, in full, the menus,[12] at the theme parks, hotels, restaurants, and shops in Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

   b.     **KENNEL CLASS**:  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102, who have been deterred from visiting Disneyland/California Adventure in California or the Walt Disney World Resort in Florida and its theme parks, hotels, restaurants, and shops on account of there being no reasonable designated areas for service animals to defecate.

   c.     **COMPANION TICKET CLASS**:  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102, who have paid for, or who will upon future visits be required to pay for, an additional ticket for a companion or aide to assist the visually impaired individual to utilize the accommodations

---

[12] Defendants point out that Plaintiffs' proposed class definition phrased this class in the conjunctive, such that each class member must have experienced a situation where he or she was not read a menu in full.  The Court assumes that this was a mistake and modifies the definition accordingly.

at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

d.   **PARADE CLASS**:  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102, who have experienced discrimination, or who will upon future visits experience discrimination, due to Defendants' policy of excluding persons with disabilities, other than wheelchair users, from preferential locations to stand or sit during the parades at Disneyland/California Adventure in California or the Walt Disney World Resort in Florida.

e.   **WEBSITE CLASS**:  All visually impaired individuals considered to have a physical disability, as that term is defined in 42 U.S.C. § 12102, who have been or who will in the future be unable to access one or more of the websites maintained by Defendants such as www.disney.go.com and were or will be denied equal access to Defendants' theme parks, hotels, restaurants and stores and the numerous goods, services and benefits offered to the public through Defendants' websites.

2.   The Court certifies the class representatives as follows:

a.   With respect to the Signage Class, the Court certifies Plaintiff Shields, Plaintiff Boggs, and Plaintiff Stockton as class representatives.

b.   With respect to the Kennel Class, the Court certifies Plaintiff Shields and Plaintiff Stockton as class representatives.

c.   With respect to the Companion Ticket Class, the Court certifies Plaintiff Shields, Plaintiff Boggs, and Plaintiff Stockton as class representatives.

d.   With respect to the Parade Class, the Court certifies Plaintiff Boggs and Plaintiff Stockton as class representatives.

e.    With respect to the Website Class, the Court certifies Plaintiff Shields, Plaintiff Boggs, and Plaintiff Stockton as class representatives.

3.    Plaintiffs' Motion for Class Certification is **DENIED** as to Plaintiffs' other proposed classes.

4.    The Court declines to certify any classes pursuant to Plaintiffs' state law claims at this time.   If it becomes apparent that the ADA cannot afford complete relief, the Court may revisit certification of subclasses for Plaintiffs' state law claims with respect to Defendants' operations at the Disneyland Resort.

5.    The dates and deadlines set forth in the Court's Scheduling and Case Management Order, filed on December 6, 2010 [Doc. # 36], are hereby **VACATED**.  The Court will issue an Amended Schedule.

**IT IS SO ORDERED.**

DATED:    June 29, 2011

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE